**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

LINDA HURLEY

     Plaintiff,

v.

EZEKIEL SPOTTS, individually; and
BOARD OF COUNTY COMMISSIONERS FOR ADAMS COUNTY COLORADO, a
municipality;

     Defendants.

---

**CIVIL RIGHTS COMPLAINT AND JURY DEMAND**

---

Plaintiff, Linda Hurley, by and through her attorneys, Kishinevsky & Raykin, hereby

brings this Complaint and Jury Demand against Ezekiel Spotts and the County of Adams,

Colorado ("Adams") (each a "Defendant" and, together, the "Defendants"), and alleges the

following:

## I.    <u>INTRODUCTION</u>

On July 18, 2023, Linda Hurley, her daughter Erika Smith—an adult disabled woman

who suffers from autism and bi-polar disorder—and her then-3-month-old granddaughter were

attacked by Adams County Sheriff's Office ("ACSO") deputy Ezekiel Spotts ("Mr. Spotts" or

"Defendant"). Ms. Hurley and her family were exiting a Walmart in Thornton, Colorado when

they encountered Mr. Spotts. Apparently angered when Ms. Smith instructed him not to block

the exit, Mr. Spotts engaged Ms. Smith just beyond the exit door. Challenging Ms. Smith to "say

it" to his face, and daring her to hit him, Mr. Spotts walked towards Ms. Smith, squared his shoulders, and pressed his chest forward in a display of intimidation. Ms. Smith stood her ground and refused to strike Mr. Spotts in response to his taunting. However, Mr. Spotts continued to escalate and shoved Ms. Smith backwards. Responding to Mr. Spotts use of physical force, and anticipating he was preparing to strike her, Ms. Smith struck Mr. Spotts. Ms. Smith's strike did little to slow Mr. Spotts continuing advance, so she slapped him again as he drew back his right hand and punched Ms. Smith with a closed fist. Seeing the confrontation, Ms. Hurley intervened and placed herself between her daughter and Mr. Spotts.

Importantly, at that time Mr. Spotts identified himself as an officer of the law. Mr. Spotts informed Ms. Hurley he was a police officer, and instructed her to stay out of the confrontation. When Ms. Hurley continued to separate Mr. Spotts from Ms. Smith, he threatened her with arrest for intervening. Mr. Spotts refused to provide his badge number, so Ms. Hurley turned and walked with her family into the Walmart parking lot.

Arriving at her car, Ms. Hurley observed Mr. Spotts and Ms. Hill coming towards her again. Mr. Spotts re-engaged, approaching Ms. Hurley's car and family. Mr. Spotts stated his intention to photograph Ms. Hurley, Ms. Smith, and the car's license plate for later use. Mr. Spotts ordered Ms. Hurley to close her trunk door so he could take the photograph. Ms. Hurley refused and told Mr. Spotts to leave. Mr. Spotts refused, then stepped forward and attempted to force the door closed. Ms. Smith stepped under the open door holding it open. Mr. Spotts then

forced his camera into Ms. Smith's face, contacting her with his hand and cellphone. Ms. Smith swatted Mr. Spotts arms away from her face, and Mr. Spotts seized her by the neck with both hands.

The force of Mr. Spotts contact knocked Ms. Smith backwards into the trunk of the car. She fell backwards while Mr. Spotts remained leaning above her, clutching her throat and cutting off her air supply. Ms. Hurley rushed to pull Mr. Spotts off her daughter but was not strong enough to loosen his grip. With both her airway and circulation cut off, Ms. Smith passed in and out of consciousness, and convulsed. Her convulsion jarred Mr. Spotts off balance, causing him to release one hand from her throat. Ms. Hurley seized the opportunity to pull Mr. Spotts free hand away from her daughter. Mr. Spotts responded by releasing Ms. Smith and transferring his attention to Ms. Hurley. Mr. Spotts seized Ms. Hurley by the arm and repeatedly punched her in the face.

The blows to the head stunned and disoriented Ms. Hurley preventing her from defending herself, but Mr. Spotts continued to punch her. After many punches, Mr. Spotts tossed Ms. Hurley away, throwing her through her nearby shopping cart and into a by-standing car. Ms. Hurley's granddaughter was still in the shopping cart when Mr. Spotts threw Ms. Hurley her into it. Ms. Hurley's body struck the cart, overturning it, and knocking her infant granddaughter to the pavement feet below. At the same time, Ms. Hurley collided with the parked car in the next stall, spraying it with blood. On the ground, L.S. remained unresponsive.

Thankfully, at this point courageous bystanders took notice of Mr. Spotts' attack and intervened. Several bystanders called 9-1-1, while others provided aid to Ms. Hurley and her family. They helped Ms. Hurley to stand and collect L.S. in a daze. They then helped Ms. Hurley into her car with the baby so Ms. Smith could take the family for emergency medical treatment. Ms. Hurley suffered a fractured skull, brain bleed, concussion, and broken nose from Mr. Spotts attack, as well as soft-tissue damage across her body.

Believing he had done nothing wrong, Mr. Spotts remained at the Walmart as Thornton Police Department ("TPD") officers arrived. Upon arrival, Mr. Spotts immediately identified himself as an off-duty ACSO deputy. Mr. Spotts explained to officers that he initiated the physical confrontation with Ms. Smith at the Walmart exit and re-engaged Ms. Hurley's family to collect photos and her license plate number. TPD officers documented Mr. Spotts' statement and minor scratches from the encounter.

Incongruously, despite (1) viewing surveillance footage showing Mr. Spotts initiate physical contact with Ms. Smith at the Walmart exit; (2) Mr. Spotts admission that he initiated both confrontations; (3) witness corroboration of Ms. Hurley and Smith's statements; and, (4) the discrepancy between the severity of Ms. Hurley and Mr. Spotts' injuries, both TPD and the Adams County District Attorney's Office declined to charge Mr. Spotts with any criminal conduct.

## II.   JURISDICTION AND VENUE

1.      This action arises under the Constitution and laws of the United States, including, 42 U.S.C. § 1983, 1988, and the laws of the State of Colorado, including Colo. Const. art. VI, § 9(1), and Colo. Rev. Stat. § 13-1-124.

2.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343 relative to the federal claims. Jurisdiction for the supplemental state law claims is conferred upon this Court by 27 U.S.C. § 1367.

3.      Venue is proper within the District of Colorado pursuant to 28 U.S.C. § 1391(b) because all the events giving rise to the claims in this matter occurred within the District of Colorado.

4.      Plaintiff timely and properly submitted a Notice of Claims in connection with the state law claims stated in this matter and has properly exhausted all administrative remedies

## III.   PARTIES

5.      At all times relevant to this action, Linda Hurley was an adult resident of the State of Colorado and citizen of the United States. At all times relevant to this action, Erika Smith was a person with disabilities as that term is defined in both Section 504 and the ADA.

6.      At all times relevant to this action, Defendant Ezekiel Spotts was a citizen of the United States and a resident of the state of Colorado and was acting under color of state law in his capacity as a law enforcement officer with the Adams County Sheriff's Office.

7.        Adams County is a municipality in the State of Colorado and is a "person" subject to suit under 42. U.S.C. § 1983.

8.        The Adams County Sheriff's Office is a department of Adams County. At all times relevant to this matter, officers, and personnel of the Adams County Sheriff's Department ("ACSO") were acting as agents of Adams County under color of state law.

9.        At all times, Defendant Adams County was responsible for the oversight, supervision, discipline, and training of ACSO personnel, including Defendant Spotts.

## IV.     FACTUAL ALLEGATIONS

10.        The Plaintiff is a dedicated mother and with a work-history in private security providing her with a strong understanding of the reasonable use of force.

11.        The Plaintiff's daughter, Ms. Smith, is a disabled woman who suffers from Autism Spectrum Disorder ("autism") and Bipolar Disorder ("bipolar").

12.        Autism is a brain development disorder that inhibits social communication and interaction. Autism is a spectrum disorder, referring to the disorder's "wide range of symptoms and severity."[1]

13.        Autism manifests through impaired communication, social interaction, and limited or repetitive behaviors.

---

[1] Autism Spectrum Disorder (https://www.mayoclinic.org/diseases-conditions/autism-spectrum-disorder/symptoms-causes/syc-20352928).

14.    Bipolar disorder is a mental health condition causing extreme mood swings from emotional highs (mania) to lows (depression).[2]

15.    Mental and intellectual disabilities manifest in behaviors that are commonly misunderstand and associated with "perceived criminal activities and threats."[3] Accordingly, officers are encouraged to moderate their reactions and give individuals time and space to gauge whether there is a real threat, or if perceived behaviors are related to disability.

16.    Unfortunately, Defendant Spotts entirely failed to apprehend and respond to Ms. Smith's disability manifestations. Instead, at each juncture, he treated Ms. Smith's disability manifestations as challenges to his authority and escalated the confrontation.

17.    Despite the Plaintiff's efforts to deescalate and retreat from the confrontation, Defendant Spotts continually instigated and exacerbated the confrontation before violently attacking the Plaintiff and her family, where she sustained significant and lasting physical and emotional injuries.

**Defendant Spotts Aggressively Contacted Ms. Smith for Instructing Him to Move His Shopping Cart Away from the Exit Door**

---

[2] Bipolar Disorder (https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/symptoms-causes/syc-20355955).
[3] Advancing Public Safety for Officers and Individuals with Intellectual and Developmental Disabilities (I/DD) (https://cops.usdoj.gov/html/dispatch/05-2019/intel_disability.html).

18.     On the afternoon of July 18, 2023, the Plaintiff took her daughter, Erika Smith, and granddaughter L.S. shopping at Walmart. Ms. Smith had recently moved back to Denver from Sedalia, Colorado, and the family needed to shop for supplies for the baby.

19.     The Plaintiff and her family went to a few stores before shopping at Walmart. At the time, the Plaintiff recognized Ms. Smith was becoming agitated related to the continued social interaction due to her autism.

20.     Hoping to reduce the social pressure on her daughter, the Plaintiff organized her family to leave the Walmart.

21.     At the same time, Defendant Spotts and Mandy Hill, also shopping at the Walmart, were also preparing to exit.

22.     As the Plaintiff and her family approached the exit, Defendant Spotts and Ms. Hill stopped their shopping cart in front of the exit door. The Plaintiff turned and passed the Defendant while Ms. Smith followed behind with the family's shopping cart. Watching her baby, at first, Ms. Smith did not realize the Defendant had stopped in front of the exit. Looking up, Ms.

Smith saw the Defendant and Ms. Hill and narrowly avoided rear-ending the Defendant's

shopping cart:

 

*The Plaintiff passes Defendant Spotts as Ms. Smith avoids colliding with the Defendant's shopping cart.*[4]

23.      As Ms. Smith passed the Defendant, she chided Defendant Spotts and Ms. Hill for

stopping their cart suddenly in front of the exit.

---

[4] Photographs of the initial incident contained herein were obtained from Walmart surveillance footage published by 9News. (https://www.9news.com/article/news/local/video-shows-off-duty-deputy-fighting-with-woman-prosecutors-decline-to-file-charges/73-ea157566-3f9d-4bfe-9647-caff9806cbe4).

24.     Defendant Spotts responded to Ms. Smith's comment with significant anger.

Following her, he called after Ms. Smith for "running her mouth", and dared her to "say it to his

face":

 

25.     Hearing Defendant Spotts, Ms. Smith turned back and faced him. Defendant

Spotts rushed to confront Ms. Smith face-to-face. Squaring his shoulders, he stalked towards,

attempting to intimidate Ms. Smith by pressing his face within inches of her own:



26.     Defendant Spotts approached Plaintiff's daughter despite the availability of an

alternative exit within feet of his location:



**Defendant Spotts Immediately Escalated the Situation by Verbally Threatening and Physically Assaulting the Plaintiff's Daughter**

27.     At this point, Defendant Spotts seriously escalated the confrontation. After failing

to intimidate Ms. Smith, Defendant Spotts escalated to physical violence. Using his left hand,

Defendant Spotts shoved Ms. Smith in the chest, knocking her backwards:



28.　　　　As Ms. Smith stumbled backwards, Defendant Spotts pushing forward.  When she regained her balance, Ms. Smith twice struck out at Defendant Spotts. Defendant Spotts continued pursuing Ms. Smith and prepared to punch her:

  

29.　　　Defendant Spotts planted his right foot and drew back his right hand with a closed fist.

Defendant Spotts punched Ms. Smith in the head, throwing her backwards:

 

30.     Defendant Spotts punch knocked Ms. Smith away from the exit and the Plaintiff

rushed to intervene as Defendant Spotts continued to pursue Ms. Smith.

 

31.     Throughout this time, Ms. Hill remained standing in the Walmart, and never

intervened.

**Defendant Spotts Identified Himself as Law Enforcement**

32.     At this point, the Plaintiff successfully separated Defendant Spotts from Ms.

Smith by placing herself in his path. However, Defendant Spotts then shifted his aggression to

Plaintiff.

33.     Defendant Spotts clearly informed Plaintiff that he was a law enforcement officer.

He threatened to arrest her for "interfering."  The Plaintiff requested his badge number, which he

refused to provide. The Plaintiff then followed her daughter into the parking lot.

**Defendant Spotts Pursued the Plaintiff After She Withdrew from the Confrontation**

34.    Defendant Spotts further escalated by following the Plaintiff and her family to their car.

35.    After being punched by Defendant Spotts, Ms. Smith walked down the wrong aisle of the parking lot. Withdrawing from Defendant Spotts, the Plaintiff caught up with her in the aisle and redirected her towards the family's car in the adjacent aisle.

1.    Defendant(s) Spotts observed Plaintiff and her family moving to their car, drew out his cell phone to use as a camera, and began to pursue them.

2.    While Plaintiff and her daughter attempted to load the trunk of their car, they observed Defendant(s) Spotts and *Ms.* Hill reapproaching. Defendant Spotts instructed Plaintiff to lower her trunk door so he could record her license plate for later use. Plaintiff refused.

**Defendant Spotts Re-Engaged Plaintiff, Escalating the Situation by Attempting to Seize Plaintiff's Property and Physically Assaulting Plaintiff, her daughter, and granddaughter.**

3.    At this point, Defendant Spotts rushed forward and grabbed Plaintiff's trunk door, attempting to force it closed. Plaintiff's daughter stepped underneath the door to keep it open.

4.    Increasingly belligerent, Defendant Spotts thrust his cell phone at Plaintiff's daughter. Defendant Spotts pressed his hand close enough to Plaintiff's daughter that he contacted

her face. In response to the physical contact, Plaintiff's daughter swatted Defendant Spotts phone away.

5. Enraged, without warning, Defendant Spotts punched Plaintiff's daughter and then seized her throat with both hands. Defendant Spotts onslaught was sudden and overwhelming. Plaintiff's daughter fell backwards into the trunk of the car, with Defendant Spotts leaning over her, continuing to throttle her airway.

6. Plaintiff's daughter struggled to pull Defendant's Spotts hands away from her throat but was unable to match his strength nor his weight pushing down on her airway. Plaintiff's daughter began to lose consciousness, her body began spasming.

7. Seeing Defendant Spotts strangling her daughter, Plaintiff attempted to pull him off, but was also unable to match his strength and weight. Fortunately, Plaintiff's daughter convulsed and kicked her legs out, knocking Defendant Spotts off balance, and causing him to loosen his grip.

8. With his grip relaxed, Plaintiff managed to pull one of Defendant Spotts' hands away from her daughter's neck.

9. Defendant Spotts then released Plaintiff's daughter and pivoted to Plaintiff. He seized her by the arm with one hand and began punching her repeatedly in the face.

10. Defendant Spotts punched Plainitff in the face approximately five times. Plaintiff's daughter regained consciousness and pushed Defendant Spotts away from her mother. Defendant Spotts then threw Plaintiff headfirst into the car in the next parking space.

11. When Defendant Spotts tossed Plaintiff's body, he threw her into her by-standing shopping cart, where her infant granddaughter remained seated. When Plaintiff's body struck the cart, it toppled over, sending the infant falling onto the pavement below.

12. The infant struck the ground and remained unresponsive.

13. Plaintiff continued her fall, and struck an adjacent vehicle, spraying it with blood.

14. Courageously several witnesses intervened and informed Defendant Spotts they were calling the police. The intervention of the witnesses forced Defendant Spotts to pause in his attack on Plaintiff and her family. Defendant Spotts then stood nearby while the witnesses helped Plaintiff stand up and staunch her profuse bleeding.

15. Regaining consciousness, Plaintiff's daughter discovered her infant child unresponsive on the pavement. Reacting quickly, Plaintiff's daughter gathered the child and her dazed and injured mother into the car and drove the family to a nearby emergency room.

16. Plaintiff's daughter told witnesses she was going to the hospital and requested that they inform the police of their location when officers arrived.

17. Witness statements captured in Thornton Police Department ("TPD") incident reports indicate that Defendant was seen, consistent with Plaintiff's own narrative, punching both

Plaintiff and her daughter in the head. One witness also observed, consistent with Plaintiff and her daughter's narratives, Defendant Spotts holding Plaintiff's daughter down in their car, with his hands near her shoulders.

18. TPD incident reports also note officers' personal observations of Walmart security footage, referenced in the above images, showing Defendant Spotts initiate the first altercation by shoving and punching Plaintiff's daughter.

19. Officers also observed Plaintiff intervene and separate Defendant Spotts from her daughter.

20. Defendant(s) Spotts and Ms. Hill also submitted written statements to TPD. Both acknowledged that Defendant Spotts initiated physical contact at the Walmart exit. Both also acknowledged Defendant Spotts approached Plaintiff at her car, where he engaged in another physical confrontation.

21. Despite **multiple eyewitness accounts** recognizing the brutality of Defendant Spotts assault, the severity of Plaintiff's injuries, and **video evidence** showing Defendant Spotts punching Plaintiff's daughter at the Walmart exit, neither Defendant(s) Spotts nor Ms. Hill acknowledged any punches beyond a single strike at Plaintiff's car nor *any* severe injury to Plaintiff.

22. These injuries—including a skull fracture, broken nose, concussion, and soft tissue damage to Plaintiff's foot—are well-documented.

23. Defendant Spotts attempted to justify his violent behavior by asserting his authority as law enforcement despite the fact that he 1) initiated the physical contact and 2) utilized overwhelming violence jeopardizing the lives of Plaintiff, her daughter, and granddaughter.

24. The inadequate training and supervision, as detailed in this Complaint, that Defendant Spotts received from Adams County influenced him to respond to this incident with excessive force.

**Ms. Hurley Suffered Significant Injuries as a Result of the Defendants' Actions and Adams County Sheriff's Office's Inadequate Training, Supervision, and Culture of Police Violence**

25. Some of the Plaintiff's injuries were immediately visible following the attack by Defendant Spotts.

26. Witness and incident reports from TPD reveal that Plaintiff was bleeding profusely from her nose, and her face and nose were red and swelling from Defendant Spotts punches.

27. Covered in blood, dazed, and dizzy from Defendant Spotts attack, Plaintiff's daughter transported her to the Emergency Department at North Suburban Medical Center ("NSMC").

28. At NSMC the Plaintiff was immediately assessed with a concussion, nasal fracture, and soft tissue damage to her face, abdomen, and left foot.

29. In the following days, the Plaintiff developed extensive bruising on her body, particularly

    clustered around her eyes and nose.

30. The following photos, 9News reveal just some of the bruising she sustained from

    Defendant Spotts' closed-fist punches and from being thrown  into a neighboring car:



31. These are just a few of the damages she suffered. Plaintiff has also suffered, among

    others, the following:

    a. Skull fracture;
    b. Impaired vision;
    c. Impaired breathing;
    d. Dizziness;
    e. Confusion;
    f. Abdominal trauma;
    g. Soft tissue damage to her left foot;
    h. Significant mental and emotional damages:
        i. Nightmares;
        ii. Severe anxiety;
        iii. Depression;
        iv. PTSD;
        v. Loss of family members; and
    i. Economic damages from being unable to work

32. Since the attack on July 18, 2023, Ms. Hurley has been forced to visit various specialists to care for: intense pain, neurological complications, post-concussive syndrome, and other ailments.

33. While dazed and confused following the attack, the Plaintiff also stumbled, and broke her right toe, subjecting her to ongoing pain and difficulty walking.

34. Because Plaintiff's neurological symptoms are complex and ongoing, Plaintiff has been prevented from working since the incident. She continues to meet with neurological specialists regularly to monitor and treat her condition.

35. The Plaintiff also began seeing a therapist following this incident owing to the trauma and emotional distress she suffered and continues to suffer.

**Adams County Hired and Retained Defendant Spotts Despite his History and Warnings Regarding the Fact that he was Unfit for Duty**

36. Prior to the incident involving the Plaintiff, Defendant Spotts was involved in a remarkably similar incident in 2017.

37. During this incident, which occurred on April 27, 2017, Defendant Spotts significantly injured an inmate at the Adams County Jail.

38. During the April 27, 2017, incident, Defendant Spotts used excessive physical force against an individual after exchanging words, leading to significant head trauma for the individual.

39. Defendant Spotts violated two department policies including one for the use of force and one for failing to complete a report detailing his use of force.

40. Given that Defendant Spotts had previously engaged in unlawful violent behavior while on duty and failed to report the use of force, Adams County knew or should have known of his propensity for violence and excessive force.

41. Adams County's decision to hire and retain Defendant Spotts provided him with the opportunity to use his authority as a police officer to violate the constitutional rights of others, and his propensity for the unlawful use of force and to act with excessive violence.

**The Actions and Inactions of the County of Adams Were Causal Factors in the Underlying Cosntitutional Violation**

42. Defendant Spotts' treatment of the Plaintiff was conducted in pursuit of Adams' training, custom, policy, and practice of unlawful conduct. Adams' longstanding, widespread, and deliberately indifferent custom, habit, practice, and/or policy of condoning and ratifying the excessive use of force caused Defendant Spotts to use unlawful and excessive force against the Plaintiff.

43. Adams police officers' unlawful conduct, including that of Defendant Spotts, as set forth in detail herein, amounts to a custom and widespread practice so pervasive and well-established as to constitute a custom or usage with the force of law.

44. Adams' unlawful customs, policies, and practices are demonstrated by its history of misconduct and brutality, as reflected in both a statistical analysis of its policing and by the many prior incidents involving Adams County officers engaging in such conduct. Accordingly, Adams knew or should have known of the obvious risk of harm faced by members of the public and individuals with disabilities when contacted by ACSO, yet the County took no or inadequate action to address such risk in the years leading up to Defendant Spotts' attack on the Plaintiff.

45. Given ACSO's long history and widespread practice of ACSO officers using excessive force against people, Adams knew or had constructive knowledge that its officers used excessive and unnecessary force and/or would be unable to competently navigate interactions with individuals with disabilities when contacting members of the community, and that such bias could cause the ACSO officers to utilize excessive and unnecessary force against disabled people like the Plaintiff's daughter.

46. In light of this knowledge, Adams County and its Sheriff could have and should have pursued reasonable methods for training and supervising ACSO officers, including Defendant Spotts, in interacting with members of the public and individuals with disabilities, and the appropriate use of force, but it failed to do so.

47. Regarding training and supervision, Adams County trained and encouraged officers to default to the use of the maximally permitted level of force rather than non-force

alternatives and to use force whenever force could be legally justified, rather than limiting the use of force for when force is necessary.

48. Regarding hiring, investigation, and discipline, Adams gives virtually unbridled authority to the Sheriff's Office. Moreover, ACSO operates in such a way that officers who violate the law or policy regularly remain on the force.

49. Adams, through the Sheriff's Office, persistently failed to meaningfully investigate and discipline numerous ACSO officers for their similar use of excessive force.

50. The Sheriff's Office's failure to find officer wrongdoing and failure to discipline officers in this case and in the cases described below and others reflects a custom, policy, and/or practice of encouraging, tolerating, and/or ratifying blatantly illegal and improper conduct. These encouragements, toleration of, and ratifications demonstrate that such police misconduct is carried out pursuant to the policies of and regimen of training provided by Adams, that such conduct is customary within ACSO, and were the moving force behind Defendants violating the Plaintiff's rights.

51. Adams' unlawful customs, policies, and/or practices are demonstrated in numerous ways, including through high profile cases showing that ACSO officers, particularly those working in the Adams County Jail, are more likely to use force without justification and to excessive levels.

52. For example, on October 9, 2009, ACSO officers seized Gary Gurule after he requested to use the bathroom. ACSO officers punched Mr. Gurule in the head, lifted him into the air, and slammed him into the floor. Mr. Gurule suffered permanent damage to his shoulder, elbow, and jaw. Officers' use of force was evidently a reaction to Mr. Gurule's statements.

53. On September 25, 2009, 64-year-old Robert Crespin was similarly seized and beaten in the Adams County Jail. Officers treated Mr. Crespin so roughly while handcuffing him that they fractured his right arm in two places, and seriously injured both rotator cuffs and shoulders.

54. The officers that injured Mr. Gurule and Mr. Crespin were not disciplined by Adams County nor the Sheriff's Office. Both incidents were evidently precipitated by words Mr. Gurule and Mr. Crespin spoke to ACSO officers. Neither Mr. Gurule nor Mr. Crespin made threats of physical violence, nor were they able to, detained within the Adams County Jail. The ACSO officers however reacted to their statements with extraordinary violence.

55. On January 22, 2011, Mario Ybarra was similarly assaulted while being booked into the Adams County Jail. As captured on video, Mr. Ybarra was standing at a printer and disparaging a deputy's lack of knowledge about operating the printer when suddenly a deputy tackled Mr. Ybarra and threw him to the ground. Several more officers then

joined in. The offending officers then all lied in their reports explaining that Mr. Ybarra attempted to walk away before being chased down. The officers lied despite clear video evidence showing Mr. Ybarra standing still before he was suddenly attacked. Again, the officers reacted to Mr. Ybarra's words with extreme violence.

56. On May 17, 2015, Alexander Garcia, a wheelchair bound individual, was assaulted by ACSO officers at the Adams County Jail. According to video evidence, as in similar statements, Mr. Garcia makes verbal comments to ACSO officers who respond with extreme violence. The officers seize Mr. Garcia, pull him from his wheelchair, and throw him to the ground. Initially, Adams County charged Mr. Garcia with assaulting the ACSO officers, before dismissing the charges. However, the affidavit entirely excluded the fact that Mr. Garcia was wheelchair bound throughout the entire encounter. As in other cases, ACSO officers reacted to Mr. Garcia's statements with extreme violence and avoided sanction for their actions.

57. On August 23, 2018, Jeffrey Helvie, was assaulted by ACSO officers. The incident occurred when an ACSO officer pulled Mr. Helvie over. Mr. Helvie declined to answer the officer's questions, who ordered him out of his car. The officer then opened the car and threw Mr. Helvie to the ground and dragged him away from the car, where he dropped his knee to Mr. Helvie's back and chest. Mr. Helvie suffered broken ribs from the officer's use of force.

58. In September 2018, John Jordan was assaulted by ACSO officers. Mr. Jordan responded to news that his nephew had been involved in a car accident while driving Mr. Jordan's company truck. At the scene of the accident, Mr. Jordan criticized the ACSO officers involved. Responding to Mr. Jordan's statements, ACSO officers seized Mr. Jordan by the arm, and took him to the ground. Importantly, the officer's decision to seize and charge Mr. Jordan was based on their perception that he was interfering with their authority. Like other cases described herein, ACSO officers reacted to the perceived challenge to their authority with violence cloaked under their authority as law enforcement.

59. On December 3, 2019, Anthony Perez was assaulted by ACSO officers. The incident, captured on a cell phone video, shows Mr. Perez telling officers "I can't breathe" before the offices punch him in the head. Before the video came to light, ACSO officers claimed that Mr. Perez was resisting arrest and, in a use of force report, none mentioned that Mr. Perez was punched in the head. Again, in Mr. Perez's case, ACSO officers reacted to comments from Mr. Perez that they apparently perceived as challenging their authority with extraordinary violence.

60. On December 13, 2023, Gabriel Sisneros was assaulted and subjected to an illegal chokehold by ACSO officers. The incident, captured on video, reveals Mr. Sisneros standing and talking with ACSO officers who suddenly seize him and place him in the

chokehold. As with the other incidents, this unlawful use of force was apparently precipitated by the ACSO officers becoming enraged by Mr. Sisneros and reacting with extraordinary force and violence.

61. This consistent pattern of unconstitutional police behavior, all or nearly all of which, was claimed by Adams itself to be within its authorized and approved policies, training, and customary practices, raises a more than plausible and compelling inference of purposeful policies, or tacit endorsement, of extreme violence by ACSO officers. Further, they reflect a marked failure to develop sufficient training or practices regarding de-escalation or alternatives to the use of extreme force. Evidence of these other wrongs, as set forth herein, is legally admissible to show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**Adams County Sheriff's Office Law Enforcement Academy and In-Service Trainings were the Moving Force and Causal Factors Behind Defendant Spotts Violating Ms. Hurley's Constitutional Rights**

62. ACSO operates its own police academy. Through training used for many years ACSO teaches officers to use aggressive tactics.

63. ACSO trains officers on what is permissible rather than what is proper, which is a chief contributor to its officers' violations of the law, including the violations to the Plaintiff.

64. ACSO officers are not sufficiently trained to utilize arrest control techniques and attempt to use tactics beyond their fitness and skill level, which results in a widespread pattern

and practice of unjustified, excessive force. This insufficient training was a causal factor in Plaintiff's assault.

65. ACSO officers have historically demonstrated they are not trained to properly use arrest control techniques, particularly martial arts techniques, to effectuate arrests, as numerous officers have demonstrated that they do not know how to respond in critical incidents.

66. ACSO in-service training is *ad hoc* and does address specific needs of the organization as shown by officer behavior.

67. Defendant Spotts was inadequately trained, which contributed to his improper and excessive force. By way of only a few examples of Defendant Spotts' inadequate training: (1) Defendant Spotts used force when no crime had been committed by Plaintiff and she otherwise posed no threat to himself or others; (2) Defendant Spotts continued to use force on Plaintiff even after she was subdued; (3) Defendant Spotts continued to escalate his level of violence despite the lack of any real threat; (4) Defendant Spotts re-initiated a violent confrontation without sufficient reason; (5) Defendant Spotts acted as expected of an untrained officer in an emotional state.

68. The responsibility for inadequate and outdated policies and training in effect at the time of Plaintiff's assault fall directly upon the County of Adams.

69. With insufficient training, officers are unequipped to effectuate arrests or regulate their behavior without resorting to dangerous tactics like those used by Defendant Spotts.

# V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Excessive Force
### Violation of the 4th Amendment
(Plaintiff Against Defendant Spotts)

70. Plaintiff hereby incorporates all other paragraphs of this Civil Rights Complaint and Jury

Demand as if set forth fully herein.

42 U.S.C. § 1983 provides:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

71. Defendant Spotts is a person for purposes of 42 U.S.C. § 1983.

72. Defendant Spotts, at all times relevant to this action, was acting under color of state law

in his capacity as an Adams County Sheriff's Office deputy, and his acts and/or

omissions were conducted within the scope of his official duties and employment.

73. At the time of the complained of events, the Plaintiff had a clearly established

constitutional right under the Fourth Amendment to be secure in her person from

unreasonable seizure through excessive force by law enforcement.

74. Any reasonable police officer knew or should have known of this right at the time of the

complained of conduct as it was clearly established at that time.

75. Defendant Spotts engaged in the use of force that was objectively unreasonable in light of the facts and circumstances confronting him, thereby violating Plaintiff's Fourth Amendment right to be free from excessive force.

76. As described in detail above, it was not objectively reasonable for Defendant Spotts to physically assault, subdue, and threaten to arrest Plaintiff in the absence of any conduct or information indicating she committed a crime, notwithstanding whether he was frustrated with her seeming interferences with his investigation.

77. The acts or omissions of Defendant Spotts were the legal and proximate cause of Plaintiff's damages.

78. As a proximate cause and result of Defendant Spotts unlawful conduct, Plaintiff has suffered actual physical bodily and emotional injuries, and other damages and losses as described herein entitling her to compensatory and special damages, in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, excruciating pain, and severe emotional distress.

79. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgement interest and costs as allowable by federal law.

80. As a direct and proximate result of the acts, omissions, and violations alleged above, the Plaintiff suffered damages, injuries, pain and suffering, emotional distress, impairment of

quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical and other expenses.

81. In addition, Plaintiff is entitled to punitive damages against Defendant Spotts, in that his actions were taken maliciously, willfully, or with a reckless or wanton disregard of the constitutional rights of the Plaintiff.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Unlawful Seizure**
**Violations of the 4th Amendment**
(Plaintiff Against Defendant Spotts)

82. Plaintiff hereby incorporates all other paragraphs of this Civil Rights Complaint and Jury Demand as if set forth fully herein.

83. Defendant Spotts was acting under color of state law with respect to his actions and inactions at all times relevant to this action.

84. At no relevant time did Defendant Spotts have probable cause or reasonable suspicion, or any other legally valid basis, to believe that the Plaintiff had committed or was committing any violation of the law prior to seizing and continuing to illegally restrain her person or property.

85. At no relevant time did Defendant Spotts have probable cause or reasonable suspicion, or any other legally valid basis, to believe that the Plaintiff had committed or was committing any violation of the law prior to illegally seizing and restraining her person or property.

86. At no relevant time did Defendant Spotts have a reasonable basis for believing that Plaintiff was an imminent danger to herself or others. No exigent circumstances existed justifying the Defendant's unlawful seizure of the Plaintiff or her property.

87. At no relevant time did Defendant Spotts have a warrant authorizing seizure of the Plaintiff's person or property.

88. During the seizure, as described in more detail above, the Defendant intentionally, forcefully, and violently restrained the Plaintiff's person against her will, despite lacking any legally valid basis for his actions.

89. Defendant Spotts' actions were objectively unreasonable in light of the circumstances confronting him, and violated clearly established law, which a reasonable official in his position would have known.

90. Defendant Spotts engaged in these unlawful actions intentionally, willfully, and wantonly.

91. As a direct and proximate result of the acts, omission, and violations alleged above, the Plaintiff suffered damages, injuries, pain and suffering, emotional distress, impairment of quality of life, past and future economic losses, including loss of earnings and loss of earning capacity, reasonable and necessary medical and other expenses.

**THIRD CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Failure to Hire, Investigate, Train, Supervise, and Discipline**
***Monell* Claim**
(Plaintiff Against Defendant Adams)

92. Plaintiff hereby incorporates all other paragraphs of this Civil Rights Complaint and Jury Demand as if fully set forth herein.

93. Adams County failed to properly train, supervise, and discipline its employees, including Defendant Spotts, with respect to the use of force and his responsibilities related to off-duty interventions and interactions with members of the public and individuals with disabilities.

94. Adams County further failed to properly train, supervise, and discipline its employees, by inculcating a responsibility on the part of the officers—through formal policy, training, and actual practices and habits within the department—to actively seek out potentially dangerous and violent interactions while off-duty, the consequences of which result in increased incidents of unwarranted and unnecessary force against members of the public and individuals with disabilities.

95. Adams, through the Sheriff's Office, failed to hire officers, specifically Defendant Spotts, in a manner that would not lead to the deprivation of the Plaintiff's constitutional rights.

96. Adams gave hiring autonomy to the Adams County Sheriff's Office, who, in turn, hired and retained Defendant Spotts despite his record of using excessive and unlawful force, and failing to report the use of force, making it plainly obvious that he was an unfit candidate and had a propensity for violence.

97. Adams, through the Adams County Sheriff's Office, also failed to discipline officers in a manner that would not lead to the unlawful use of force. The Sheriff's Office fails and refuses to discipline officers for the unlawful use of excessive force, sending a signal that Adams not only tolerates, but actually endorses and awards officers who use excessive force.

98. Adams' failure to, in its supervisory duties, adequately investigate and hire, train, supervise, and discipline its officers with respect to the use of excessive force is a custom, policy, and/or practice of Adams and a moving force behind the constitutional violation described herein.

99. The constitutional violations—federal and state—perpetrated against the Plaintiff in this manner were a foreseeable consequence of Adams' actions and inactions.

100. Adams was deliberately indifferent to the constitutional rights of its citizens by failing to properly train, monitor, supervise, and discipline its employees with respect to the use of excessive force, aggressive off-duty policing, and interacting with members of the public and individuals with disabilities. Adams could have and should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees.

101. Adams' policies, customs, and/or practices in failing to properly monitor, train, supervise, and discipline its employees were the causal force and proximate cause of the violation of the Plaintiff's federal and state constitutional rights.

102.     The acts or omissions of Adams caused Plaintiff damages in that she suffered

extreme physical injuries and pain and extensive emotional and mental suffering during

and after the assault.

103.     The actions or omissions of Adams as described herein deprived Plaintiff of the

rights, privileges, liberties, and immunities, secured by the Constitution of the United

States of America, and caused her other damages.

**FOURTH CLAIM FOR RELIEF**
**Colo. Rev. Stat. § 13-21-131**
**Colo. Const. Art. II, Section 7 – *Excessive Force***
(Against Defendant Spotts)

104.     Plaintiff hereby incorporates all other paragraphs of this Civil Rights Complaint

and Jury Demand as if set forth herein.

105.     At all relevant times, Defendant Spotts was a "peace officer" under C.R.S. § 24-

31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

106.     At all relevant times, Defendant Spotts was acting under color of state law in his

capacity as an Adams County Sheriff's Office law enforcement officer.

107.     Plaintiff has a protected interest under Colorado Constitution Article II, Section 7,

in being free from the use of excessive force by law enforcement personnel.

108.     Defendant Spotts violated Plaintiff's state constitutional rights by using

objectively unreasonable force against Plaintiff.

109.     Defendant Spotts seized Plaintiff by means of unreasonable physical force including but not limited to, punching the Plaintiff in the face and head numerous times with a closed fist, and throwing Plaintiff to the ground.

110.     Defendant Spotts had no reasonable basis to believe Plaintiff posed a threat of harm to him or any other person.

111.     Defendant Spotts did not have a legally valid basis to seize Plaintiff in this manner and with the level of force used under the circumstances presented.

112.     Defendant Spotts use of force against Plaintiff, as described here, was objectively unreasonable in light of the circumstances confronting him before and during the encounter with Plaintiff.

113.     Defendant Spotts subjected or caused Plaintiff to be subjected to the deprivation of individual rights secured by the bill of rights of the Colorado Constitution.

114.     Defendant Spotts did not act upon a good faith and reasonable belief that his actions in using unreasonable and excessive force against Plaintiff was lawful.

115.     The actions and inactions of Defendant Spotts' employer, Adams County, through the Adams County Sheriff's Office, were moving forces behind and causal factors of the underlying constitutional violations to the Plaintiff.

116.     Given that the actions and inactions of Adams, as described throughout this

Complaint, were causal factors of the underlying constitutional violations, pursuant to

C.R.S. § 13-21-131(4)(a), Adams must indemnify Defendant Spotts.

117.     Also pursuant to C.R.S. § 13-21-131(4)(a), even if Aurora determines that

Defendant Spotts did not act upon a good faith and reasonable belief that his actions were

lawful, then Defendant Spotts merely "shall not be indemnified [by Adams County] for

five percent of the judgement or settlement or twenty-five thousand dollars, whichever is

less."

118.     In other words, even if Adams County's actions and inactions are not found to be

causal factors in the underlying violations, Adams can only escape indemnification in the

amount of five precent of the judgement or settlement or twenty-five thousand dollars,

whichever is less. Even so, under this scenario, "if [Defendant Spotts'] portion of the

judgement is uncollectible, [Adams County] shall satisfy the full amount of the

judgement or settlement." C.R.S. § 13-21-131(4)(a). [5]

119.     By failing to sufficiently train and discipline ACSO officers regarding de-

escalation and the proper use of force, appropriate conduct for off-duty officers, and

---

[5] "[A] plaintiff may be the beneficiary of indemnification by the municipality if the peace officer does not have the funds to pay the judgment." Ditirro v. Sando, 520 P.3d 1203, 1209 (Colo. App. 2022).

interacting with members of the public and individuals with disabilities, among other things, Adams County caused the Plaintiff to subjected to a deprivation of her civil rights.

120.     Adams County's well-documented history of using excessive force without fear of discipline, failure to train its officers in proper arrest control techniques, failure to require ongoing training for officers, and condoning years of police brutality were the cause and moving force of the Plaintiff's civil rights deprivations.

121.     Adams County failed to create and oversee appropriate expectations for responsible behavior, and these failures were the moving force behind Defendant Spotts' unlawful use of force against the Plaintiff.

122.     Adams County, through the Adams County Sheriff's Office, also failed to investigate and hire officers in a manner that would not lead to unlawful use of force by ACSO officers.

123.     Adams County is liable for the acts and omissions of its agents and/or employees, and for the herein described acts by Defendant Spotts, who was acting within the scope and course of his employment.

124.     Defendant Spotts' conduct described herein was attended by circumstances of malice, or willful and wanton conduct, which Defendant Spotts must have realized was dangerous, or that was done heedlessly and recklessly, without regard to the consequences, or of the rights and safety of others, particularly Plaintiff.

WHEREFORE, Plaintiff respectfuly requests that this Court enter judgement in her favor, and against the Defendants, and award all relief as allowed by law and equity as appropriate, including, without limitation, the following:

a.  Declaratory and injunctive relief;

b.  Actual economic damages as established at trial;

c.  Compensatory damages, including, without limitation, those for past and future pecuniary and non-pecuniary losses, pain and suffering, emotional distress, impairment of quality of life, reasonable and necessary medical and other expenses;

d.  Pre- and post-judgement interest at the highest lawful rate;

e.  Attorneys' fees and costs of associated with this action; and

f.  Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Dated this October 24, 2024

*/s/ Igor Raykin*
Igor Raykin
Conor O'Donnell
2851 S. Parker Rd.
Ste 150
Aurora, Colorado 80014
(720) 863-4256 (p)
igor@coloradolawteam.com
conor@coloradolawteam.com